IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:26-CR-45 |
| NEHEMIE ALMONOR, | The Honorable Rossie D. Alston, Jr. |
| *Defendant.* | Sentencing Date: July 1, 2026 |

## <u>UNITED STATES' POSITION ON SENTENCING</u>

The vast majority of public servants do not choose government work for a high salary or a lavish life. Instead, they work in public service with aspirations of incrementally improving the lives of the American people through honest and hard work. Most public servants work long hours, for modest pay and very little recognition. When any public servant begins their service, they take an oath. An oath not to serve themselves, but instead the interests of the public.

Nehemie Almonor (the "defendant") was a public servant who violated this oath. For approximately three years, the defendant used the privilege of remote government telework, originally put in place to save American lives during the COVID-19 pandemic, to defraud four federal agencies, a private company, and the U.S. military out of hundreds of thousands of taxpayer dollars. The defendant falsely claimed full-time work for three positions and, at times, the U.S. military simultaneously, in effect stealing the hard-earned resources provided by the American taxpayer.

The defendant deployed her niche skills, specialized education, and deep experience as a Human Resources Acquisition Specialist for federal government employment to facilitate her fraud. She falsified official ethics documents; kept three work laptops open next to one another to

deceive her employers; and made baseless and serious accusations against the public servants tasked with investigating her conduct, in order to evade responsibility.

The defendant was a longtime career federal worker and military servicemember with a solemn responsibility and obligation to the American public. The defendant betrayed this trust and violated her oath for personal enrichment. For the reasons stated below, the United States respectfully submits that a Guidelines sentence of 21 months' incarceration, followed by three years of supervised release, is sufficient but not greater than necessary, to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## Background and Offense Conduct

To be convicted of Wire Fraud, pursuant to 18 U.S.C. § 1343, a defendant must have: (1) devised or intended to devise a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises that were material; and (2) for the purpose of executing the scheme, the defendant transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce any writings, signs, signals, pictures, or sounds. *See* Eric Wm. Ruschky, Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina, (2024 Online Edition, p. 257) (citing, *inter alia, United States v. Godwin,* 272 F.3d 659, 666 (4th Cir. 2001); *United States v. Jefferson,* 674 F.3d 332, 366 (4th Cir. 2012); *United States v. Curry,* 461 F.3d 452, 457 (4th Cir. 2006)).

### A. The Defendant's Scheme to Defraud Four Federal Agencies, the U.S. Military, and a Private Company

From at least May 2022 to at least April 2025, the defendant electronically submitted timecards, in interstate commerce, certifying that she performed full-time work for multiple entities during the same overlapping hours. Statement of Facts, ECF No. 14 at ¶¶ 1 and 2. These entities included a private company, the U.S. Air Force, and four federal agencies. *Id.* at ¶ 2.

2

Throughout this conduct, the defendant submitted falsified timecards, commonly attesting to have worked three full-time positions simultaneously, certifying 120 hours or more in single 40-hour weekly work periods. *Id.* Below is a representative timeline of the defendant's offense conduct, which caused an overall loss of $291,905.32 collectively to the six separate identified victims. ECF No. 14 at ¶ 12.[1]



### B. The COVID-19 Transition to Fully Remote Government Telework

In response to the global health crisis caused by the COVID-19 pandemic, many federal government agencies began transitioning certain federal employees and contractors to full-time remote telework in and around late 2019 and early 2020. Although the global health crisis ended, many federal employees and contractors continued to telework remotely, on a full-time basis,

---

[1] The agreed loss amount attributed to each victim entity is a calculation based on a partitive division formula. The formula credits the defendant with legitimately working a cumulative 40 hours per week and calculates loss as follows: if the defendant claimed full-time 40-hour weekly pay for two victim entities simultaneously, she would be responsible in restitution for 20 hours of pay (half) from each of these entities, at her respective pay rate for each. If the defendant claimed full-time 40-hour weekly pay for three victim entities at once, she would be responsible in restitution for 2/3rds of her pay rate at each respective entity, again, crediting her for 40 hours of legitimate weekly work.

through and around January 2025.

Included in this transition to full-time telework, were the U.S. Transportation Security Administration ("TSA"); the U.S. Department of Housing and Urban Development ("HUD"); the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); and the U.S. Food and Drug Administration ("FDA"). Many private sector companies, such as "Company-1," also began offering a wider range of full-time telework options.

On January 20, 2025, Presidential Memorandum, *Return to In-Person Work,* directed "…all departments and agencies in the executive branch of Government shall, as soon as practicable, take all necessary steps to terminate remote work arrangements and require employees to return to work in-person at their respective duty stations on a full-time basis…"[2] Included in this Presidential Memorandum were, among other agencies, TSA, HUD, ATF, and FDA.

### C.  The Defendant's First Post-COVID Employment with Company-1

In January 2022, the defendant began a full-time telework position for a private company ("Company-1") headquartered in the Eastern District of Virginia. ECF No. 14 at ¶ 3. The defendant was hired as a Human Resources Assistant, and was required to work 40 hours per week, Monday through Friday, between 8:30 A.M. and 5:30 P.M. *Id.* The defendant held this position through at least April 6, 2026. Presentence Investigation Report (PSR), ECF No. 18 at ¶ 74. To be explained below, the defendant caused an overall loss to Company-1 of at least $69,022.19. *Id.* at ¶ 7.

### D.  The Timecard Fraud Begins: Defrauding TSA and Company-1

In May 2022, five months after beginning full-time work for Company-1, the defendant accepted a second full-time teleworking position with TSA. ECF No. 14 at ¶ 4. The defendant was

---

[2]    *See* Presidential Memorandum (PM), *Return to In-Person Work* (January 20, 2025) https://www.whitehouse.gov/presidential-actions/2025/01/return-to-in-person-work/

hired as a Human Resources Specialist and earned an annual salary of $132,638.00. *Id.* The defendant was required to work 40 hours per week, Monday through Thursday, between 7:30 A.M. and 5:30 P.M. *Id.* When she applied for and accepted this TSA position, the defendant told TSA that she did not have any other employment. *Id.* This representation was false, as she was already employed by Company-1 on a full-time basis. *Id.* The defendant held this position through August 11, 2025. *See* PSR at ¶ 31. Overall, the defendant caused a loss to TSA of at least $132,101.82. *Id.* at ¶ 7.

### E.  The Timecard Fraud Compounds: Defrauding TSA, Company-1, and HUD

In September 2022, while already employed in two full-time telework positions with Company-1 and TSA, the defendant applied for and accepted a third full-time teleworking role with HUD through a private contractor. ECF No. 14 at ¶ 5. The defendant was hired as a Human Resources Acquisitions Specialist and earned an annual salary of $100,000.00. *Id.* The defendant was required to work 40 hours per week, Monday through Friday, between 8:00 A.M. and 6:00 P.M. *Id.* When she applied for and accepted this HUD role, the defendant told HUD that she was completely unemployed and, therefore, able to start work immediately. *Id.* This representation was false, as she was already employed on simultaneous full-time bases by Company-1 and TSA. *Id.* The defendant held this position until September 2023. *Id.* Overall, the defendant caused a loss to HUD of at least $37,253.80. PSR at ¶ 7.

### F.  The Timecard Fraud Persists: Defrauding ATF

In and around mid-2023, while still employed in three full-time teleworking positions with Company-1, TSA, and HUD, the defendant applied for an additional full-time teleworking position with ATF through another private contractor. ECF No. 14 at ¶ 6. She began this position with ATF in October 2023 and resigned from her HUD position prior to claiming pay for ATF. *Id.* The

defendant was hired as a Human Resources Specialist and earned an annual salary of $110,000.00. *Id.* The defendant was required to work 40 hours per week, Monday through Friday, between 6:00 A.M. and 6:00 P.M. *Id.* The defendant held this position until June 2024. *Id.* Overall, the defendant caused a loss to ATF of at least $32,519.40. PSR at ¶ 7.

### G. Repeated False Statements Made to TSA Ethics Office: "It is humanly impossible"

On December 22, 2023, after having claimed full-time work for three jobs simultaneously for over a year, the defendant submitted two DHS Form 480s ("Request for Prior Approval of Outside Employment/Activity") for permission to work for Company-1 and ATF in addition to TSA. *Id.* at ¶ 29. On these forms, the defendant claimed that she planned to work 36 hours per week for Company-1 and 24 hours per week for ATF. *Id.* These claims were false, as she was already working 40+ hours per week for *both* Company-1 and ATF at that time. ECF No. 14 at ¶¶ 3 and 5.

These requests were rejected by the defendant's supervisor, who noted the defendant "ha[d] not proposed how she would work 40 hours at TSA, 24 hours at [ATF], and 36 hours at [Company-1]. However, as her supervisor, I believe that the extent of the hours requested would prevent her from being capable of performing the duties of her TSA position." PSR at ¶ 29. In internal communications to the TSA Ethics Officer explaining the rejection, the defendant's supervisor stated: "I cannot approved [*sic*] [the defendant] to work 100 hours a week, it is humanly impossible. That many hours of outside work would limit her ability to accomplish the 40 hours that is required for her TSA position." *Id.* In truth, at this time, the defendant was already claiming pay for at least 120 hours per week. ECF No. 14 at ¶¶ 3 and 5.

Following this rejection, five weeks later, on January 30, 2024, the defendant submitted another set of DHS Form 480s for outside employment with both Company-1 and ATF. PSR at ¶

30. On these revised forms, the defendant falsely reduced the proposed hours for each outside employer, stating she would work 35 hours per week for Company-1 and 20 weekly hours for ATF. *Id.* She also falsely stated that she would work for TSA from 7:00 A.M. to 3:00 P.M. Monday through Friday; at Company-1 from 5:00 P.M. to 11 P.M. Monday through Friday and then 6:30 A.M. to 11:30 A.M. on weekends; and at ATF on weekends from 12:00 P.M. to 10:00 P.M. *Id.* These subsequent falsified requests were then approved. *Id.*

### H. Continually Defrauding the Federal Government: Timecard Fraud Against FDA

In October 2024, while still employed in two full-time teleworking positions with Company-1 and TSA, the defendant began an additional full-time teleworking position with the FDA through another private contractor. ECF No. 14 at ¶ 7. The defendant was hired as a Human Resources Specialist and earned an annual salary similar to her other government positions. *Id.* The defendant was required to work 40 hours per week, Monday through Friday, between 6:00 A.M. and 2:00 P.M. *Id.* The defendant held this position until at least April 2025. *Id.* Overall, the defendant caused a loss to FDA of at least $9,462.01. PSR at ¶ 7.

### I. Defrauding the U.S. Military: Timecard Fraud Against the U.S. Air Force

In addition to working up to three full-time positions at once, the defendant also claimed full-time hours, on a periodic basis, with the U.S. Department of War, in the U.S. Air Force Reserves. ECF No. 14 at ¶ 8. While certifying full-time work on military orders, the defendant simultaneously submitted timecards claiming full-time work for Company-1, TSA, and ATF. *Id.* The defendant was not allowed to complete any non-military work while on military orders, and the defendant was aware of this. *Id.* [3] Overall, the defendant caused a loss to the U.S. Air Force of

---

[3] To be discussed below, on August 11, 2025, the defendant participated in a voluntary interview with law enforcement agents from TSA. In this interview, the defendant falsely stated to the agents that she was given special permission from her military command leadership to complete outside, non-military work on official military orders.

at least $11,546.10. PSR at ¶ 7.

**J.   Steps Taken to Deceive Employers: At least Three Work Laptops Open at Once**

While claiming full-time work for three telework positions and, at times, the U.S. Air Force, during the same hours, TSA received multiple complaints that the defendant was commonly unreachable during the hours she attested to have worked on her timecards. ECF No. 14 at ¶ 11. While perpetrating the offense conduct, the defendant commonly kept at least three work laptop computers open next to each other at her home. *Id.* at ¶ 10. She did this to falsely represent to each of her employers that she was online and working full-time *solely* for each entity. *Id.*

**K.   Accusing Case Agents of Opening the Investigation because of Racism and Sexism**

On August 11, 2025, law enforcement agents with TSA served the defendant with a standard target letter to notify her of the investigation. PSR at ¶ 31. After receiving the letter, the defendant participated in a voluntary interview with the agents. *Id.*[4] Following the interview, on November 19, 2025, the defendant decided to file an informal Equal Employment Opportunity (EEO) claim against one of the investigating agents. *Id.* at ¶ 32. The defendant claimed that the investigation was the result of both race and sex discrimination. *Id.* The defendant requested TSA put the investigating agent on "suspension without pay (e.g., 5-14 days) and removal from supervisory or sensitive duties." *Id.*

The Assigned EEO Counselor notified the defendant that her informal claim period had ended, and that she had 15 days to submit a formal complaint. *Id.* The defendant did not pursue a formal claim against the case agent, and, therefore, her complaint that she "was discriminated against on the bases of race (African American) and sex (female) when inappropriately

---

[4] This recorded interview was provided to the defendant, through counsel, at the start of the Presentence Investigation period.

investigated […] regarding criminal charges lodged against her" then ended.[5]

### L.  Procedural History: The Defendant Pleads Guilty to Wire Fraud

On February 27, 2026, the Government filed a Criminal Information charging the defendant with one count of Wire Fraud, in violation of 18 U.S.C. § 1343. ECF No. 3. On April 1, 2026, the defendant pleaded guilty to the Criminal Information before this Court, ECF No. 12, and waived indictment. ECF Nos. 11 and 15. A Presentence Investigation Report was Ordered by the Court, ECF No. 12, and the defendant was released pursuant to certain conditions. ECF No. 16. Sentencing was ultimately set for July 1, 2026. ECF No. 12; Scheduling Order, April 9, 2026.

### Sentencing Guidelines

Although the Supreme Court has held that the Guidelines are no longer mandatory, the Court has nonetheless directed that "district courts … must consult [the] Guidelines and take them into account when sentencing." *United States v. Booker,* 543 U.S. 220, 264 (2005). Thus, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

### A.  The United States' Objection to the PSR: § 3B1.3 Use of Special Skill Applies

On May 27, 2026, the Draft PSR was filed with objections due by June 12, 2026. ECF No. 17. On June 10, 2026, undersigned counsel for the United States noted the objection to the assigned Probation Officer and counsel for the defendant by email. PSR at 24 (Addendum).

In sum, the United States objects to the PSR's failure to apply U.S.S.G. § 3B1.3, namely, use of a "special skill" to the defendant's Guidelines calculation. Accordingly, a sentence of 21 months' incarceration is a low-end Guidelines sentence in this case, and sufficient but not greater

---

[5] The Government obtained the defendant's informal Equal Employment Opportunity claim and records from TSA during the course of the investigation. These documents were produced to the defendant, through counsel, at the start of the Presentence Investigation period.

than necessary, to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

### B. U.S.S.G. § 3B1.3: Abuse of a Position of Trust or Use of a Special Skill

In pertinent part, the § 3B1.3 +2 Adjustment applies if a "defendant abused a position of public or private trust, *or used a special skill,* in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3 (emphasis added). According to Application Note 4, a "special skill" is "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3, cmt. n.4; *see United States v. Longwell,* 410 F. App'x 684, 692 (4th Cir. 2011) (quoting § 3B1.3's "special skill" definition). However, "the list of examples given in the commentary is obviously not exhaustive." *United States v. Hummer,* 916 F.2d 186, 191 (4th Cir. 1990).

Applying the special skill adjustment "requires some explanation of exactly how a defendant's training assisted his criminal conduct." *United States v. Sprouse,* 58 F. App'x 985, 989 (4th Cir. 2003). Although a special skill generally requires "substantial education, training, or licensing…substantial training is not a mandatory prerequisite to making a special skills adjustment." *United States v. Mooney,* No. 9:14-CR-00054, 2016 WL 6583108, at *5 (D.S.C. Nov. 7, 2016) (citing *United States v. Gormley,* 201 F.3d 290, 295–96 (4th Cir. 2000)) (quoting *Hummer,* 916 F.2d at *id.*). Instead, the "skill may also have been 'obtained through the substantial equivalent of such training and must not be one that is possessed by members of the general public.'" *Mooney,* 2016 WL 6583108, at *id.* (quoting *Gormley,* 201 F.3d at *id.*).

### C. The Fourth Circuit Caselaw on U.S.S.G. § 3B1.3 is Clear

The Fourth Circuit jurisprudence is clear that a special skill must derive from education, training or experience not possessed by members of the general public and requires a distinct

analysis from the public trust inquiry, also under § 3B1.3.

### i. *Mooney:* Education, Training, and Experience Not Held by the General Public

In *Mooney,* the defendant was convicted of making false and fraudulent statements while operating an international child adoption agency, in violation of 42 U.S.C. § 14944. *Mooney,* 2016 WL 6583108, at *1. At sentencing, the +2 Adjustment was applied, pursuant to U.S.S.G. § 3B1.3, specifically for the use of a special skill. *Id.* at *5. The Court found that the defendant's "education, training and experience in facilitating adoptions were special skills that are not held by the general public and that not only facilitated her offense, but made it possible." *Id.* The defendant had "used her special skills in this field, which she had acquired through a combination of her education, training, and experience, to commit her offense." *Id.*

### ii. *Longwell:* A Skill Must Not Be Possessed by the General Public and Must Be Obtained Through Training or Licensing

In *Longwell,* the defendant, a licensed mortgage broker, was convicted of concealment of assets in connection with a pending bankruptcy case, in violation of 18 U.S.C. § 152(1); and two counts of false statements in connection with a bankruptcy case, in violation of 18 U.S.C. § 152(2). *Longwell,* 410 F. App'x at 685. At sentencing, the § 3B1.3 special skill Adjustment was applied based on the defendant's being a mortgage broker. *Id.* at 687, 691-92.

In upholding the special skill Adjustment, the Fourth Circuit found that "while mortgage brokers may not endure the same level of training as a doctor, pilot, or lawyer, they certainly possess a skill not possessed by members of the general public which is obtained through training and licensing. Thus, the skill possessed by a mortgage broker qualifies as a special skill for the purposes of U.S.S.G. § 3B1.3." *Id.* at 692.

### iii. *Gormley:* Cannot be a Skill "that Millions of Americans Exercise Every Year"

In *Gormley,* the defendant was convicted of conspiracy against the United States, in

violation of 18 U.S.C. § 286; and 17 counts of making fraudulent statements. *Gormley,* 201 F.3d at 292. The defendant's convictions derived from his conduct while working in the tax preparation business. *Id.* at 293. In this role, the defendant conspired to make "claims for nonexistent or non-qualifying dependents, falsified wage and income information, and fraudulent tax credit claims." *Id.*

In overturning the application of the special skill Adjustment, the Fourth Circuit identified, *inter alia,* that the defendant had no "formal training in the areas of tax preparation or accounting," and that a "skill must at least be one that is obtained through the substantial equivalent of such training and must not be one that is possessed by members of the general public." *Id.* at 296. The *Gormley* Court held that experience in a skill like tax preparation is one "that millions of Americans exercise every year," and, therefore, the Adjustment was inapplicable. *Id.*

### iv.    *Sprouse:* A Skill Must Be More than a Firefighter Striking a Match

In *Sprouse,* the defendant, a second lieutenant volunteer firefighter, was convicted of two counts of willfully and without authority setting fire to timber and other vegetation in a National Forest, in violation of 18 U.S.C. § 1855. *Sprouse,* 58 F. App'x at 986. At sentencing, the district court applied the special skill Adjustment under § 3B1.3. In reversing the Adjustment, the Fourth Circuit found that since the defendant committed the offense conduct by "simply us[ing] a match to light the fires, he was not acting as a firefighter when he set the fires, and there [was] no record of any action he took to conceal his" conduct, an adequate basis did not exist supporting that the defendant's position or training aided him in committing or concealing the offense. *Id.* at 988.

### D.  The Defendant's Use of a Special Skill is at the Heartland of § 3B1.3

A Human Resources Acquisition Specialist with an expertise in federal government agency employment, who uses this niche skill to fraudulently obtain employment at multiple federal

government agencies, is exactly the special situation that § 3B1.3 was created for. The defendant's professional ability–her precise "special skill"–was everything related to the hiring and onboarding process of federal government employment. Notably, she was the public point-of-contact on USAJOBS.gov postings for government agencies (e.g., for ATF) – the threshold entry point for being hired by any federal agency. Addendum at 24.[6]

Throughout the scheme, as an experienced Human Resources "expert" specialized in hiring and onboarding federal workers, the defendant used this specialized knowledge, education, and skill to fraudulently secure federal employment and successfully progress through the onboarding and background check processes with various agencies simultaneously.

i.    **Interview Answers: A "Well Versed" Federal Government Acquisition Specialist**

This special skill was articulated by the defendant in her voluntary interview with law enforcement on August 11, 2025. In the interview, the defendant answered "yes" when asked if in her work in federal government Human Resources, she "advise[s] people on what…their rights are and what policy actions they are supposed to take regarding employment." *Id.* When asked about certain employment documents she filled out, the defendant told the agents: "If you'd like me to go pull it, I can go pull it. *I'm in HR…*" *Id.*

When asked if "all of these [jobs] specifically were for Human Resources; [for example] it was Human Resources Acquisition Specialist…all the work that you preformed for the other entities were human resource jobs?[,]" the defendant responded: "that is correct." *Id.* When asked if she was "well versed" in all-things federal government human resources, as a result of these specific positions, the defendant again responded: "Yeah." *Id.*

---

[6] The underlying USAJOBS documentation was produced to the defendant, through counsel, at the start of the Presentence Investigation period.

**ii.     Professional Resume Submitted to HUD: "Senior HR Specialist Utilizing an Expert Level of Knowledge and Skill"**

In her application for HUD, the defendant listed on her resume that she had "years of human resources-focused experience supported by a Bachelors of Business Administration in Human Resources Management." *Id.*[7] She listed her experience as a "Human Resources Specialist" with the Navy and Marine Corps, stating that she "served as a Senior HR Specialist utilizing an expert level of knowledge and skill in applying the full range of HR methods, principles [and] practices" and that she "advised management on recruitment strategies, sources, special programs, recruitment…and retention programs." *Id.* at 25.

The defendant also stated that she "completed the hiring process: confirming the selection, initiating background investigation, obtaining agency record checks and release dates, making the job offer, setting pay, processing the EOD, and conducting new employee orientation." *Id.* The defendant similarly stated that she "advised management on recruiting strategy, sources, special incentives and special programs to fill hard-to-fill positions." *Id.* She also "provided comprehensive HR management advisory and technical services on substantive organizational functions." *Id.*

**iii.    Professional Resume Submitted to ATF: "Provides Expert Advice on Alternatives and Techniques for Staffing Positions"**

In her application for ATF, the defendant listed on her resume that at TSA she "analyzes, evaluates, and develops major aspects of…HR strategic workforce planning program initiatives to accomplish organizational goals and objectives; [and] leads strategic planning sessions with managers on short and long-term staffing requirements and needs." *Id.*[8] The defendant stated she

---

[7] The defendant's resume for HUD was produced to the defendant, through counsel, at the start of the Presentence Investigation period.

[8] The defendant's resume for ATF was produced to the defendant, through counsel, at the start of the Presentence Investigation period.

"provides advice and guidance on existing and new Federal HR regulations, laws, and policies and procedural requirements; ensures policy and program issuances are integrated with staff actions and fully supportive of Agency requirements, the Federal merit system, and equal employment opportunity objectives." *Id.*

She also stated that she "provides expert advice on alternatives and techniques for staffing positions including recruitment options, internal placement opportunities, special employment programs, and available hiring flexibilities […] directs, initiates and leads complex studies and projects related to strategic planning, human capital, and diversity including development and integration of methods for measuring program success and achievement of objectives." *Id.*

### iv.    The § 3B1.3 Special Skill Adjustment Squarely Applies to the Defendant

Based on the defendant's own interview answers and her professional resumes submitted for employment at both HUD and ATF, it is clear that the special skill Adjustment is applicable to the defendant's Guidelines calculation. Indeed, the defendant agrees that she not only possesses a special skill in federal government acquisition, but an "expert" level skill. Surely, an expert skill in any field is the very antithesis to a skill held by the general public, as discussed in each of the above cited cases.

Unlike in *Gormley,* where the defendant had no formal training or education, and had not obtained this through any substantial equivalent, here, the evidence shows just the opposite. The defendant has a Bachelor of Business Administration, specifically in Human Resources Management. She has professional Human Resources experience going back about a decade, and has substantial experience advising management-level officials in federal government recruitment strategies; conducted every stage of the government hiring and boarding processes; led strategic planning sessions with managers on government staffing requirements and needs; and also

15

spearheaded complex studies and projects regarding strategic planning for human capital. Like the defendants in *Mooney* and *Longwell,* here, the defendant's skill was acquired through her education, training, and comprehensive experience.

The defendant also used her special skill in a manner that significantly facilitated the commission of the offense. Unlike *Sprouse,* where a volunteer firefighter merely lit a matchstick to start a fire, not applying his firefighting skills in a way that facilitated the offense, here, the defendant's expertise was significant to the facilitation of the crime.

As an experienced government Acquisition Specialist, the defendant knew exactly what responses prospective government employers would find favorable; that working multiple government positions at once would be looked upon unfavorably, as opposed to overachieving, as it might in the private sector (she "advise[s] people on what […] their rights are and what policy actions they are supposed to take regarding employment"); and knew how to craft applications for government positions on websites such as USAJOBS.gov, as she advised management on recruiting decisions, led strategic planning sessions with management on staffing requirements and needs, and was the threshold point-of-contact for USAJOBS employment postings, herself. In short, the defendant's use of this special skill in the commission of the offense was "significant," as the term is used in § 3B1.3, and a far cry from the *Sprouse* firefighter's striking of a match.

> v.    **The Probation Officer's Response is, Respectfully, Misplaced**

In the Response to the United States' objection, the PSR counters, in part, that:

> Court and investigative materials do not indicate that the defendant's positions as a Human Resource Specialist were positions of public or private trust as they were not characterized by professional or managerial discretion - i.e., substantial discretionary judgment ordinarily given considerable deference. Additionally, materials do not reflect she was subject to significantly less supervision than employees performing primarily non-discretionary duties…

Addendum at 25. Respectfully, this analysis erroneously conflates the requirements for applying the Adjustment in the context of a position of trust, which is a wholly separate inquiry from the special skill analysis. The Response quotes and applies Application Note 1, which serves to define "Public or Private Trust." U.S.S.G. § 3B1.3, cmt. n.1.

Instead, the operative commentary applicable to the "special skill" variation of the Adjustment is found in Application Note 4. U.S.S.G. § 3B1.3, cmt. n.4. The Adjustment is constructed disjunctively; "Abuse of Position of Trust" and "Use of Special Skill" are always separated by the dividing "*or.*" This is supported by the above jurisprudence, which makes the same distinction in its analysis.[9]

Indeed, § 3B1.3 also makes this disjunctive distinction clear in the body text of the Adjustment:

> If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under §3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under §3B1.1 (Aggravating Role).

§3B1.1. The Sentencing Guidelines did not include this distinction superfluously. Instead, it was implemented to make clear that the use of a special skill and the abuse of trust are entirely separate and independent functions of the Adjustment. *See United States v. Crawford,* 792 F. Supp. 3d 670, 692 (E.D. Va. 2025) ("Ordinarily, when two statutory phrases differ in their text, they ought to be read in a manner that gives them distinct meaning, or, in other words, in a way that does not render one phrase surplusage") (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (1st ed. 2012)).

---

[9] As to the Probation Officer's Response that the defendant's special skill did "not involve a specialized skill that is difficult to acquire or uncommon among similarly situated workers," and that it "does not appear she used a special skill in a manner that significantly facilitated the commission or concealment of the offense," the United States respectfully disagrees, and has addressed these points in the larger analysis above.

For the foregoing reasons, the +2 Adjustment under § 3B1.3 for use of a special skill should be applied to the defendant's Guidelines calculation.

### E. The Defendant's Total Offense Level: 16

The Base Offense Level for the defendant's Wire Fraud conviction is 7, pursuant to U.S.S.G. § 2B1.1(a)(1). PSR at ¶ 40. The defendant receives a Specific Offense Characteristic of +12 for causing a loss exceeding $250,000, but less than $550,000, under U.S.S.G. § 2B1.1(b)(1)(G). *Id.* ¶ 41. As discussed above, it is appropriate for the defendant to receive a +2 Adjustment, based on her use of a special skill, under U.S.S.G. § 3B1.3.

Two levels are reduced for Acceptance of Responsibility, under U.S.S.G. § 3E1.1(a). *Id.* at ¶ 46. Under § 3E1.1(b), the United States moves for an additional level reduction. *Id.* at ¶ 47. The defendant's Criminal History Score is zero. *Id.* at ¶ 43. Therefore, under Chapter 5, Part A of the Guidelines, the defendant is in Criminal History Category I. *Id.* at ¶ 52. A two-level reduction is also applied for being a Zero-Point Offender, under U.S.S.G. § 4C1.1(a). *Id.* at ¶ 48.

### F. The Defendant's Guidelines Calculation: 21-27 Months of Incarceration

A violation of Wire Fraud provides maximum penalties of 20 years of incarceration, 18 U.S.C. § 1343; three years of supervised release, 18 U.S.C. § 3583(b)(2); a probationary term of not less than one year, but no more than five years, 18 U.S.C. § 3561(c)(1); a fine of $250,000, 18 U.S.C. § 3571(b)(3); and a special assessment of $100, 18 U.S.C. § 3013(a)(2)(A). Based on a total Offense Level of 16 and a Criminal History Category of I, the applicable Guidelines range for the defendant is 21-27 months of incarceration.[10]

### STATUTORY ANALYSIS AND RECOMMENDATION

To reflect the seriousness of the nature and circumstances of the offense, provide for just

---

[10] The United States further notes, that even if the Court overrules the United States' PSR objection, a term of 21 months of incarceration would still be a Guidelines sentence in this case.

punishment, promote respect for the law, and afford strong deterrence to other similarly situated individuals, the United States respectfully recommends a Guidelines sentence of 21 months of incarceration, followed by three years of supervised release.

### A.  The 18 U.S.C. § 3553(a) Factors

Besides calculating the Guidelines range, a sentencing court must also consider the seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the need for the court's sentence to (A) "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[,]" (B) afford adequate deterrence, (C) protect the public, and (D) provide the defendant with needed care or training; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution. 18 U.S.C. § 3553(a)(1)-(7); *see also Gall,* 552 U.S. at 50, n.6 ("The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.").

### B.  A Sentence of 21 Months of Incarceration is Necessary to Reflect the Seriousness of the Offense

The nature and circumstances of the defendant's offense conduct were serious and warrant a meaningful carceral sentence of 21 months. Over an approximate three-year period, the defendant defrauded four federal agencies, a private company, and the U.S. military. She took advantage of legacy COVID-era emergency remote telework that was put in place in response to a worldwide health crisis. The defendant abused this unprecedented situation for personal enrichment. She repeatedly lied to multiple federal agencies, falsely claiming to be completely unemployed to obtain simultaneous full-time positions at the taxpayers' expense.

19

In reality, the defendant was at home with at least three work laptops open at the same time, in order to deceive all her employers into believing she was online and working solely for each of them. The defendant lied on multiple ethics forms to the Department of Homeland Security about when she would be working, and, when finally apprehended, she baselessly accused the TSA investigator of racism and sexism, calling for *him* to be punished for investigating her fraud.

For these reasons, a sentence of 21 months is necessary to appropriately reflect the seriousness of the offense.

### C. A Sentence of 21 Months' Incarceration is Necessary to Provide for Just Punishment

The imposition of a 21-month sentence is necessary to provide just punishment. The defendant was a public servant and military servicemember who took an oath to work solely in the interest of the American public. The defendant violated this oath for personal enrichment and used her "expert" knowledge, education, and skill specifically in this niche sector to effectuate the scheme.

She held multiple government jobs simultaneously that each paid her six figure salaries. While stealing from multiple executive branch agencies, she also defrauded the U.S. military and a private sector company. As one of her supervisors stated in communications to the TSA Ethics Officer, the number of hours the defendant initially claimed to be working–at least 20 hours per week less than what she was actually already claiming–was "humanly impossible." Indeed, TSA received multiple complaints about the defendant being inaccessible during the hours she was claiming to work.

The defendant abused a pandemic-era measure implemented out of necessity to save Americans lives from a time of global crisis. She defrauded the federal government for years; covered her tracks by resubmitting falsified ethics documents; endeavored to deceive her employers by keeping multiple work laptop computers open at once; and then attempted to evade

accountability for her conduct by making extremely serious and false claims against the public servants responsible for investigating government fraud and safeguarding U.S. tax dollars.

The defendant's offense conduct was calculated, long running, and egregious. For these reasons, a sentence of 21 months is necessary to provide for just punishment.

A.  **A Sentence of 21 Months' Incarceration is Necessary to Promote Respect for the Law and Afford Adequate Deterrence to Other Similarly Situated Individuals**

Above all, a 21-month carceral sentence is necessary to promote respect for the law and to adequately deter others who hold similar positions and like inclinations. The defendant was a public servant who abused her position through an emergency telework policy to enrich herself at the expense of the American taxpayer. For any society to function, the citizenry needs to have a genuine faith in the institutions of its government. For the social contract between the people and its government to work, the public must have the confidence that their government exists to serve them – not steal from them.

When public servants, like the defendant, abuse their positions to enrich themselves through taxpayer dollars, the public loses faith in their government, and the social contract binding the two together is fundamentally weakened. This is a unique case where a strong message needs to be sent: in this District and throughout the country, a public servant's theft of taxpayer funds for personal profit will be met with meaningful consequence by the justice system. By imposing a carceral sentence of 21 months, the Court will put other similarly inclined individuals on notice that this type of criminal behavior perpetrated against the American public will be reliably detected, expeditiously stopped, and significantly punished.

## CONCLUSION

To preserve the American public's confidence in their government, the United States respectfully recommends the Court impose a Guidelines sentence of 21 months' incarceration,

21

followed by three years of supervised release.

Respectfully submitted,

Todd W. Blanche
Acting Attorney General

By: _____

Date:   June 24, 2026

Jake A. Drucker
Special Assistant United States Attorney
Tony R. Roberts
Assistant United States Attorney
Phone: (202) 794-4142
Email: Jake.Drucker@usdoj.gov

22

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2026, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record.

By: _____

Jake A. Drucker
Special Assistant United States Attorney
Counsel for the United States
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (202) 794-4142
Email: Jake.Drucker@usdoj.gov