**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:26-CR-00045-RDA-1 |
| | ) | |
| NEHEMIE ALMONOR | ) | |

**POSITION WITH REGARD TO 3553(a) FACTORS**

Ms. NEHEMIE ALMONOR, pursuant to Fed. R. Crim. P. 32, respectfully submits her position in support of a probationary sentence.

**I.    Statutory Penalties**

This Court shall consider "the kinds of sentences available."[1]

On April 1, 2026, Ms. Almonor pleaded guilty to one count of wire fraud in violation of 18 U.S.C. § 1343 (Count One).[2] Count One is punishable by, *inter alia*, a term of imprisonment not more than twenty years, a term of supervised release of three years, and a maximum fine of $250,000.[3] There is no statutorily-mandated term of imprisonment related to this offense.

**II.    Sentencing Guidelines**

This Court "shall consider . . . the kinds of sentence[s] and sentencing range[s] established" by the sentencing guidelines.[4]

Ms. Almonor concurs with the sentencing guidelines range as Probation calculated in the Presentence Investigation Report ("PSR"), which is as follows:[5]

| | |
|---|---|
| Base Offense Level | 7 |
| Loss Amount | +12 |
| Acceptance of Responsibility | -2 |

---

[1] 18 U.S.C. § 3553(a)(3).
[2] Plea Agreement, ECF No 13.
[3] 18 U.S.C. § 1343
[4] 18 U.S.C. § 3553(a)(4).
[5] PSR ¶¶ 39–49, June 23, 2026.

1

| | |
|---|---|
| Acceptance of Responsibility | -1 |
| Chapter Four Adjustment (Zero Criminal History) | -2 |
| Total Offense Level | 14 |
| Criminal History Score | I(0) |
| Guidelines Range | 15–21 Months |

Ms. Almonor further submits the following in support of Probation's rejection of the Government's objection to the PSR.[6]

The Government's position must be rejected because (1) it rests on an unwarranted and overbroad equation of professional experiences with a "special skill" defined by the Guidelines, and (2) Ms. Almonor did not "use" the purported skill to facilitate the commission of the offense.

First, USSG §3B1.3 does not apply whenever a defendant has a resume, a senior title, or substantial workplace experience. It applies only when the defendant used a skill "not possessed by members of the general public and usually requiring substantial education, training, or licensing," in a manner that significantly facilitated the commission or concealment of the offense.[7] Application Note 4 to USSG § 3B1.3 also lists examples such as "pilots, lawyers, doctors, accountants, chemists, and demolition experts," indicating that the skill must be meaningfully specialized, technical, or licensed, not merely a general professional aptitude.

In *United States v. Gormley*, 201 F.3d 290 (4th Cir. 2000), the Fourth Circuit held that tax preparation as practiced by Gormley was not a "special skill" warranting a §3B1.3 enhancement. There, Gormley had operated a tax-preparation business for several years, participated in preparing fraudulent tax-refund claims, and had experience gathering taxpayer information and supplying false entries. The court emphasized that the skill must be "on par with" the guideline examples. [8] Gormley's role of gathering information and fabricating dependents, income information, filing status, and tax credit claims did not qualify.[9]

---

[6] Addendum to the PSR at 24–25, June 23, 2026.
[7] USSG §3B1.3 comment. (n.4).
[8] *Id.* at 296.
[9] *Id.* at 297.

Similarly, here, if years of tax preparation experience used in a tax refund fraud did not amount to a special skill, then experience in hiring, recruiting, onboarding, and human capital acquisition does not become a §3B1.3 special skill merely because Ms. Almonor described herself as "well versed," "senior," or "expert" on a resume.

More importantly, in no way can the Government's theory satisfy the "use" requirement. Pursuant to §3B1.3, an enhancement applies only when the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."[10] In United States v. Stone, 85 Fed. App'x 925 (4th Cir. 2004), the Fourth Circuit emphasized that, "[i]n any event, to qualify under the guidelines, the special skill must, at a minimum, be used to actually commit or conceal the crime, rather than merely to establish trust in a victim upon whom the defendant then perpetrates a garden variety fraud."[11] There, the court rejected the government's special-skill theory even though the defendant was a lead electrician whose specialized knowledge gave him credibility and workplace discretion. The court explained that the defendant did not directly use electrical skills to commit the fraud; he used his position and access.[12]

The same distinction matters here. According to the PSR, Ms. Almonor committed the charged fraud by submitting false and fraudulent timecards to multiple entities during overlapping hours, which show she worked 120 or more hours in a forty-hour period.[13] It is patently clear that the commission of the fraud has nothing to do with the purported special skills. While Ms. Almonor worked as a Human Resources Assistant or Specialist for those companies, she did not use any of

---

[10] USSG §3B1.3.

[11] Id. at 937 (internal quotation omitted).

[12] Id. See also United States v. Ellen, 961 F.2d 462 (4th Cir. 1992) (refusing to impose enhancement for use  of special skill" for conviction based on polluting wetlands was not clearly erroneous, even though the defendant had extensive experience in wetlands construction and permit acquisition, given that special skills possessed by the defendant did not facilitate offense).

[13] PSR ¶ 16, June 23, 2026.

the special skills listed on her resume to commit the fraud. Rather, the fraud here is straightforward and does not involve any advanced human resources skills.

### III.    18 U.S.C. § 3553

#### a.    Nature and Circumstances of the Offense and the History and Characteristics of Ms. Almonor (18 U.S.C. § 3553(a)(1))

##### 1.    Nature and Circumstances of the Offense

The nature and circumstances of Ms. Almonor's offense support a probationary sentence.[14] Ms. Almonor fully accepts responsibility for her illegal conduct and submits the following in support of a probationary sentence.

Beginning in May 2022, Ms. Almonor submitted timecards to several companies certifying that she had worked full-time for all of them simultaneously.[15] Though Ms. Almonor understood this was a falsehood, she truly believed she could perform all her job duties to the best of her ability for all the companies she worked for. Ms. Almonor maintained employment at these companies for several years without her employers noting subpar work.[16] Indeed, Ms. Almonor's attorney contacted several of the companies that Ms. Almonor worked for at this time, and though most declined to comment, Ms. Almonor's colleagues at the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives and the U.S. Transportation Security Administration all remembered her as a good employee with whom they had positive experiences. Ms. Almonor is not a seasoned or violent criminal, but a woman who mistakenly thought that by working hard at several jobs at once, she could provide a stable, happy life for her young children.

Ms. Almonor quickly accepted responsibility as soon as she realized the gravity of her actions.[17] She waived indictment and pleaded guilty to an information, saving this Court valuable

---

[14] 18 U.S.C. § 3553(a)(1).
[15] PSR ¶ 16, June 23, 2026.
[16] *See generally* PSR, June 23, 2026.
[17] PSR ¶ 38, June 23, 2026.

time and resources, and allowing her former employers to collect the restitution they are owed as quickly as possible.[18] Ms. Almonor deeply regrets any harm that she may have caused through her work, and is prepared to pay any restitution and or forfeiture that this Court imposes. At the request of the Government, she is in the process of liquidating two vehicles, a CD, and a significant portion of her savings. Ms. Almonor intends to be in a position to transfer these funds prior to the sentencing hearing.

### 2.    History and Characteristics of Ms. Almonor

### A.    Trauma and PTSD

Ms. Almonor's stepfather was abusive to her and her siblings throughout her childhood.[19] His extreme punishments included beatings with his hands or household objects, and forcing Ms. Almonor to kneel on rice.[20] She was often left in charge of her younger siblings and expected to run the household, preventing the young Ms. Almonor from spending time with her peers.[21] When Ms. Almonor was fifteen or sixteen years old, the abuse from her stepfather came to a head, and she was kicked out of her family home.[22]

This behavior instilled a deep sense of fear and instability in Ms. Almonor's life. Studies have shown that physical, emotional, and other abuse in children impairs cognition and is highly correlated with impulsive delinquent behaviors and mental illness.[23] Ms. Almonor's childhood trauma does not excuse her illegal behavior; however, this Court must consider how these facts impacted her ability to make sound, prosocial choices. When all someone has known is disorder

---

[18] Waiver of Indictment, ECF No. 11.
[19] PSR ¶ 58, June 23, 2026.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] Lane Strathearn *et al.*, *Long-Term Cognitive, Psychological, and Health Outcomes Associated With Child Abuse and Neglect*, 146(4) Pediatrics 1–15, 12 (2020).

and trauma, it is no stretch of the imagination to understand that their history will impact their future decision-making abilities.

After spending the rest of her teenage years at her aunt's house, Ms. Almonor joined the military at age eighteen.[24] Ms. Almonor served her country in the United States Marine Corps from 2003 to 2007; she was deployed to a combat zone in Iraq for part of that service.[25] Ms. Almonor separated from the U.S. Marine Corps honorably in 2007 after becoming pregnant.[26] In 2013, Ms. Almonor rejoined the military as a staff sergeant in the Air Force Reserve.[27] Ms. Almonor took time away from the Air Force Reserve in 2016, but has since rejoined and been promoted to Technical Sergeant.[28] Ms. Almonor is still employed by the Air Force Reserve, which is aware of the instant matter.[29]

While overseas in her twenties, Ms. Almonor was a victim of a random sexual assault by an unknown individual.[30] Ms. Almonor also served for years in a combat zone in Iraq in her early twenties.[31] Ms. Almonor was diagnosed with Post Traumatic Stress Disorder ("PTSD") in 2025.[32]

People with PTSD experience the world differently; their neurology functions differently from that of healthy or neurotypical individuals.[33] Neural circuits in brain-imaging studies show abnormal activity in "anterior cingulate cortex, vmPFC, amygdala, hippocampus, insula, and lateral prefrontal cortex . . . ." all of which affect decision making, emotional regulation, and

---

[24] PSR ¶¶ 58–59, June 23, 2026.
[25] PSR ¶ 78, June 23, 2026.
[26] *Id.*
[27] PSR ¶ 77, June 23, 2026.
[28] *Id.*
[29] *Id.*
[30] PSR ¶ 59, June 23, 2026.
[31] PSR ¶ 78, June 23, 2026.
[32] PSR ¶ 68, June 23, 2026.
[33] Jasmeet P. Hayes, *et al., Emotion and Cognition Interactions in PTSD: A Review of Neurocognitive and Neuroimaging Studies,* 6 Frontiers in Integrative Neuroscience 1, 1–14 (2013).

memory.[34] As a result, people with PTSD have poor memory for details, falsely remember new information, and have slow cognitive processing.[35]

Ms. Almonor's exposure to severe trauma has dramatically altered her brain functions, which have influenced her ability to make sound, prosocial choices. There are serious risks associated with imprisoning people who have suffered trauma. Thus, allowing Ms. Almonor to continue receiving stable and ongoing treatment for her psychological conditions with care providers she knows and trusts is the most optimal course of action.

### B.    Ms. Almonor's Children

Ms. Almonor is a dedicated single mother to four children: a twenty-year-old daughter, an eleven-year-old son, and twin nine-year-old daughters.[36] Ms. Almonor's minor children reside with her, and all of her children rely on her for personal, emotional, and financial support.[37] Her children's fathers have no contact or communication with them.[38] Should Ms. Almonor be sentenced to imprisonment, she fears for her children's safety. Moreover, a term of incarceration would be damaging to Ms. Almonor's family structure. Studies have shown that children with incarcerated parents suffer emotionally, financially, and educationally.[39] As a result, Ms. Almonor requests a probationary sentence so that her children can remain in their current home.

### b.    Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))

A probationary sentence will be sufficient, but not greater than necessary, to afford adequate deterrence of criminal conduct.[40]

---

[34] *Id.*
[35] *Id.*
[36] PSR ¶ 60, June 23, 2026.
[37] *Id*.
[38] *Id*.
[39] Eric Martin, *Hidden Consequences: The Impact of Incarceration on Dependent Children*, 278 Nat l. Inst. J. (2017).
[40] 18 U.S.C. § 3553(a)(2)(B).

According to the United States Department of Justice ("DOJ"), "the certainty of being caught is a vastly more powerful deterrent than the punishment."[41] The speed and certainty of punishment, not its severity, deter crime; there is no evidence that the deterrent effect of punishment increases with the length of imprisonment.[42] This is because criminals rarely understand the specific punishments associated with the crimes that they commit.[43] As such, the fact that Ms. Almonor was arrested and will receive a punishment—even if it is a probationary sentence—will be the most deterrent factor for future criminals, not the length of her sentence.

     c.     **Need to Protect the Public from Ms. Almonor's Future Criminal Conduct (18 U.S.C. § 3553(a)(2)(C))**

A probationary sentence will be sufficient, but not greater than necessary, to protect the public from Ms. Almonor's future criminal conduct, in the unlikely event it should occur.[44]

First, Ms. Almonor pleaded guilty to a non-violent crime that caused purely financial harm. While for violent offenders, the need for physical incapacitation provided by a sentence of imprisonment is strong, the same is not true of a non-violent offender like Ms. Almonor. Non-custodial supervision would be just as effective as imprisonment in preventing Ms. Almonor from committing a future offense, as her internet activity, communications, and financial activity can be easily monitored at a lower cost.

Additionally, Ms. Almonor is forty-one years old and has zero criminal history.[45] There is a sharp decline in the likelihood of recidivism after age thirty-five.[46] In one Department of Justice

---

[41] DOJ, *Five Things About Deterrence*, Nat l Inst. Justice (2016) (citing Robert Sampson, *et al.*, *On the Robustness and Validity of Groups*, 20(1) J. of Quantitative Criminology 37–42 (2004), and Daniel Nagin, *et al.*, *Imprisonment and Reoffending*, 38 Crime and Just. 115–200 (2009)).
[42] *Id.*
[43] *Id.*
[44] 18 U.S.C. § 3553(a)(2)(C).
[45] PSR ¶ at 2, June 23, 2026.
[46] Ryan Cotter, *et al.*, *Recidivism of Federal Offenders Released in 2010*, U.S. Sent g Comm n (2021).

Report, the author writes, "[a] more severe (i.e., lengthy) prison sentence for convicted individuals who are naturally aging out of crime . . . is a costly way to deter future crimes by aging individuals who already are less likely to commit those crimes by virtue of age."[47] A term of imprisonment for Ms. Almonor would thus be a waste of resources, as she is in an age range statistically unlikely to re-offend, especially considering the fact that she is a non-violent offender.[48] A probationary sentence would be sufficient to protect the general public from the remote possibility that she will reoffend.

### d. Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment (18 U.S.C. § 3553(a)(2))

#### 1. Reflect the Seriousness of the Offense and Provide Just Punishment

A probationary sentence will be sufficient, but not greater than necessary, to reflect the seriousness of the offense and to provide just punishment.[49]

Ms. Almonor will suffer the financial consequences of the instant offense for the rest of her life. On average, people who have served a prison sentence experience a 52% decrease in subsequent annual earnings.[50] The average lifetime loss of earnings for people who have served a term of imprisonment is $484,400.[51] Indeed, Ms. Almonor has already lost her primary source of income as a result of the instant offense.[52] The collateral consequences of this offense alone are

---

[47] DOJ, *Five Things About Deterrence*, Nat l Inst. Justice (2016) (citing Robert Sampson, *et al.*, *On the Robustness and Validity of Groups*, 20(1) J. of Quantitative Criminology 37–42 (2004), and Daniel Nagin, *et al.*, *Imprisonment and Reoffending*, 38 Crime and Just. 115–200 (2009)).

[48] *See generally* PSR, June 23, 2026.

[49] 18 U.S.C. § 3553(a)(2).

[50] Terry-Ann Craigie, *et al.*, *Conviction, Imprisonment, and Lost Earnings How Involvement with the Criminal Justice System Deepens Inequality*, 7 (2020).

[51] *Id.* at 7.

[52] PSR ¶ 74, June 23, 2026.

sufficient to reflect its seriousness and provide just punishment, supporting a probationary sentence.

Second, a sentence that most closely reflects the offense would permit Ms. Almonor to work to pay restitution. Again, Ms. Almonor committed a purely financial crime.[53] The harm she caused can be remedied through restitution, and the fastest way for her to do so is to continue working outside of prison. A term of imprisonment would force her to discontinue her current employment with the Air Force Reserve, slowing her ability to pay restitution.[54] Ms. Almonor recognizes that work programs are available to inmates in federal prisons. However, in these programs, inmates earn between $0.12 and $0.14 per hour, which is 1% of the federal minimum wage of $7.25 per hour.[55] A term of imprisonment would only serve to delay the rate at which Ms. Almonor can strive to make the companies she worked for whole, supporting a probationary sentence.

### 2. Promote Respect for the Law

A probationary sentence will be sufficient but not greater than necessary to promote respect for the law.[56]

On April 1, 2026, this Court released Ms. Almonor on conditions of release.[57] Since then, Ms. Almonor has complied with all conditions of release, demonstrating her ability to abide by the

---

[53] *See generally* PSR, June 23, 2026.
[54] PSR ¶ 77, June 23, 2026.
[55] *See* National Conference of State Legislatures, *State Minimum Wages* (Jan. 5, 2026), https://www.ncsl.org/labor-and-employment/state-minimum-wages *and* Federal Bureau of Prisons, *Work Programs*, https://www.bop.gov/inmates/custody_and_care/work_programs.jsp#:~:text=Federal%20Bureau%20of%20Prisons&text=Sentenced%20inmates%20are%20required%20to,hour%20for%20these%20work%20assignments (last visited Apr. 1, 2026); U.S. Department of Labor, *Minimum Wage*, https://www.dol.gov/general/topic/wages/minimumwage (last visited Apr. 1, 2026).
[56] 18 U.S.C. § 3553(a)(2).
[57] Order Setting Conditions of Release, ECF No. 16.

law.[58] Moreover, Ms. Almonor has unequivocally accepted responsibility for her actions.[59] Her compliant behavior upon release and her acceptance of responsibility demonstrate that her mere arrest and conviction were sufficient to foster a deep respect for the law; therefore, a probationary sentence would be sufficient.

       **e.**       **Substance Abuse and Mental Health Treatment or Vocational Training (18 U.S.C. § 3553(a)(2)(D))**

Ms. Almonor will participate in any self-development opportunities that this Court deems appropriate, in or out of custody.

       **f.**       **Need to Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))**

Ms. Almonor submits that a sentence below the sentencing guidelines range is necessary to avoid unwarranted sentencing disparities.[60]

During the last five fiscal years (FY2021-2025), there were 523 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 14 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure.[61] For the 409 defendants who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was ten months, and the median length of imprisonment imposed was twelve months.[62]

## IV.    Letters in Support

Ms. Almonor submits the attached six letters in support of this Court's leniency at the sentencing hearing.

---

[58] *See generally* Docket Report, Feb. 27, 2026.

[59] PSR ¶ 38, June 23, 2026.

[60] 18 U.S.C. § 3553(a)(6).

[61] U.S. Sent g Comm n, *Judiciary Sentencing INformation*, https://jsin.ussc.gov/analytics/saw.dll?Dashboard

[62] *Id.*

## V.   Recommended Designation

Ms. Almonor respectfully requests that, should she be sentenced to a term of imprisonment, this Court recommend that she be placed in a facility as close as possible to her family.

## VI.   Conclusion

Ms. Almonor, based on the foregoing assertions and arguments, prays that this Court issue a probationary sentence.

Date:      June 26, 2026

Respectfully Submitted,

*/s/ Terry C. Frank*
Terry C. Frank, Esq.
(VSB No. 74890)
Terry Frank Law
6722 Patterson Avenue, Ste. B
Richmond, Virginia 23226
P: (804) 899-8089 F: (804) 899-8229
terry@terryfranklaw.com

*s/ Murdoch Walker, II*
Murdoch Walker, II, Esq.
Ga. Bar # 163417
mwalker@lowtherwalker.com

Lowther | Walker LLC
101 Marietta St. NW, Ste. 3650
Atlanta, GA 30303
O 404.496.4052 | F 866.819.7859
www.lowtherwalker.com
*Attorneys for Defendant Nehemie Almonor*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2026, I electronically filed the foregoing POSITION WITH REGARD TO 3553(a) FACTORS with the Clerk of the United States District Court for the Eastern District of Virginia by way of the CM/ECF system, which automatically will serve this document on the attorneys of record for the parties in this case by electronic mail.

Date:          June 26, 2026

Respectfully Submitted,

*/s/ Terry C. Frank*
Terry C. Frank, Esq.
(VSB No. 74890)
Terry Frank Law
6722 Patterson Avenue, Ste. B
Richmond, Virginia 23226
P: (804) 899-8089 F: (804) 899-8229
terry@terryfranklaw.com